UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| THOMAS A. RUSSELL, M.D., PATRICK BURKE, GERARD INSLEY, AMANDA KIELY, PAUL BURKE, THOMAS MADDEN, and AIDEEN JENNINGS, <br><br> Plaintiffs, <br><br> v. <br><br> ZIMMER, INC., <br><br> Defendant. | CAUSE NO.: 2:20-CV-200-TLS-JEM |

**OPINION AND ORDER**

This matter is before the Court on the Defendant's Motion to Dismiss Plaintiffs' First Amended Complaint [ECF No. 61]. The motion is fully briefed and ripe for ruling. Because the Plaintiffs have not alleged facts to state a plausible claim that the Defendant breached the requirement of the parties' stock purchase agreement to use "commercially reasonable efforts" to sell the Earnout Products, the Court grants the motion.

**MOTION TO DISMISS STANDARD**

"A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the viability of a complaint by arguing that it fails to state a claim upon which relief may be granted." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014) (citing Fed. R. Civ. P. 12(b)(6); *Gen. Elec. Cap. Corp. v. Lease Resol. Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997)). When reviewing a complaint attacked by a Rule 12(b)(6) motion, a court construes the complaint in the light most favorable to the non-moving party, accepts the factual allegations as true, and draws all inferences in the non-moving party's favor. *Bell v. City of Chicago*, 835 F.3d 736, 738 (7th Cir. 2016). "Factual allegations must be enough to raise a right to relief above the

speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

## PROCEDURAL BACKGROUND

The Plaintiffs filed this action against the Defendant in the United States District Court for the Western District of Tennessee, alleging claims of fraudulent inducement, breach of contract, breach of the implied covenant of good faith and fair dealing, and declaratory judgment. ECF No. 1. The Defendant filed a motion to transfer venue pursuant to the forum selection clause in the stock purchase agreement and a motion to dismiss under Federal Rules of Civil Procedure 9 and 12(b)(6). ECF Nos. 20, 22. The motion to transfer venue was granted, and the motion to dismiss was denied without prejudice to be refiled following transfer. ECF No. 33.

Upon transfer, the Plaintiffs filed a motion for leave to amend the complaint, which the Defendant did not oppose while reserving the right to file a motion to dismiss. ECF Nos. 51, 54. With leave of court, the Plaintiffs filed the Amended Complaint [ECF No. 56] bringing a single claim of breach of contract. The Plaintiffs allege that they entered into an enforceable Stock Purchase Agreement (SPA) with the Defendant; the Defendant breached the SPA by failing to use "commercially reasonable efforts" to sell the Earnout Products during the Earnout Period, from January 1, 2017, through the present; and the Plaintiffs have suffered damages in an amount to be determined at trial. Am. Compl. ¶¶ 65–67, ECF No. 56.

**FACTUAL BACKGROUND**

This lawsuit involves the N-Force Fixation System, the first surgical device designed for the treatment of bone fractures, reconstructions, and bone loss with a bioresorbable bone substitute material (BSM) injected directly into the bone. *Id.* at ¶ 12. The system addresses a previously unmet need in orthopedic surgery and is the first regulatory cleared, patented, and clinically evaluated augmentation fixation device approved for sale in the United States, Europe, and Australia. *Id*. at ¶ 14. The N-Force Fixation System is designed to be used with bone substitute material such as iN3 bone cement, which is the first commercially available premix orthopedic calcium phosphate bone substitute material. *Id.* at ¶ 15.

The Plaintiffs Thomas A. Russell, M.D., Patrick Burke, Gerard Insley, Amanda Kiely, Paul Burke, Thomas Madden, and Aideen Jennings are former shareholders of CelgenTek Innovations Corporation (CelgenTek). *Id.* at ¶ 8. CelgenTek was a merger of two start-up companies involved with aspects of the N-Force Fixation System and the iN3 bone cement. *Id.* at ¶ 23. The Defendant Zimmer, Inc. is a global designer, manufacturer, and distributor of medical devices headquartered in Warsaw, Indiana. *Id.* at ¶¶ 9, 25.

On June 3, 2015, CelgenTek's Board of Directors (the Plaintiffs) and its Medical Advisory Board met in Dublin, Ireland, to consider whether to pursue a business relationship with the Defendant regarding the N-Force Fixation System and the iN3 bone cement. *Id.* at ¶¶ 25, 26. At the meeting, Randy S. Sessler, the Defendant's Vice President and General Manager of Global Trauma, represented that the Defendant was serious about its desire to enter into a distribution agreement with CelgenTek, ultimately purchase CelgenTek's stock, and market and sell the N-Force Fixation System products in all its potential applications on a worldwide basis, including the undertaking of supporting clinical trials. *Id*. at ¶¶ 27–30.

3

On October 7, 2015, CelgenTek and the Defendant entered into an Exclusive Distribution Agreement whereby the Defendant became the sole distributor worldwide of the products associated with the N-Force Fixation System. *Id*. at ¶ 32. The Plaintiffs allege that the Defendant did not market the products as promised, and the lack of orders placed CelgenTek in "dire financial circumstances." *Id*. at ¶¶ 35, 42. In light of CelgenTek's likely bankruptcy, the Plaintiffs initiated negotiations that led to the Defendant acquiring 10% equity ownership of CelgenTek for $2,000,000 on November 20, 2015. *Id*. at ¶¶ 37, 38. In February 2016, the Defendant provided CelgenTek with a $941,999.61 purchase order at the demand of Dr. Russell to alleviate the financial difficulties. *Id*. at ¶¶ 42, 43. The Defendant subsequently made cash loans to CelgenTek of $2,000,000 and $355,320. *Id.* at ¶ 40.

On September 27, 2016, the Defendant, the Plaintiffs, and CelgenTek entered into the SPA, whereby the Defendant purchased CelgenTek's remaining shares in exchange for $17,118,560 in cash and the potential for the Plaintiffs to earn contingent "Earnout Payments" based on the Defendant's post-closing sales of the "Earnout Products," which included the N-Force Fixation System and iN3 bone cement. *Id*. at ¶¶ 51, 53; Am. Compl. Ex. A, ECF No. 56-1; *id.* at § 2.05(a)(iii). The SPA gave the Defendant exclusive, world-wide distribution rights to promote, sell, distribute, import/export, and otherwise commercialize the Earnout Products for all applications. Am. Compl. ¶ 57.

Under Section 2.05, titled "Contingent Consideration," the Defendant was to make quarterly Earnout Payments in an amount equal to 6% of the Net Sales of Trauma Products and 1.5% of the Net Sales of Non-Trauma Products. *Id*. at ¶ 55; Am. Compl. Ex. A, § 2.05(b). From the date the SPA was executed through December 31, 2019, the Defendant paid the Plaintiffs approximately $129,500 in Earnout Payments. Am. Compl. ¶ 63.

Under that same section, the Defendant was required to use "commercially reasonable efforts" to sell the Earnout Products during the Earnout Period from January 1, 2017, through December 31, 2033. *Id.* at ¶¶ 58–60; *see* Am. Compl. Ex. A § 2.05(a), (e). The specific provisions of Sections 2.05(a)(i) and (e) regarding "commercially reasonable efforts" are set forth in the Court's analysis below. The Plaintiffs allege that the Defendant failed to use "commercially reasonable efforts" to sell the technology as demonstrated by the following actions and inactions, among others:

a) Failed to retain the members of the CelgenTek commercial team involved in market development in Europe;
b) Failed to engage with the CelgenTek Medical Advisory Boards in Europe and North America;
c) Sent a field notification to customers stating that the product supply was to be terminated based on "strictly a business decision;"
d) Terminated the clinical trial at the Leeds, United Kingdom, General Infirmary;
e) Failed to initiate a global clinical trial in hip fractures with Professor Mohit Bhandari as promised by Randy Sessler;
f) Allowed the CE Mark regulatory approval for the N-Force products and the iN3 Cement to expire;
g) Terminated key individuals who were involved with and were knowledgeable about the product;
h) Ceased N-Force product manufacturing activity at the Memphis facility;
i) Terminated the Supply and Exclusive Distribution Agreement with Innotere GmbH in Radebeul, Germany, for calcium phosphate paste;
j) Failed to transfer the manufacturing of the iN3 cement from CelgenTek Shannon to any Zimmer Biomet facility;
k) Failed to secure manufacturing capability for the N-Force Fixation System by dismantling all equipment and facilities and regulatory approvals;
l) Failed to meet customer orders in Europe;
m) Removed instrumentation sets for N-Force Fixation System application from customer locations;
n) Failed to commercialize the product in Australia despite the fact that the product was registered and granted reimbursement status in Australia in 2016[;]
o) Failed to ship the products to Australia despite multiple staff training and registration fees;
p) Failed to support new European sales with existing and new customers despite multiple product training sessions;
q) Failed to develop and provide appropriate marketing materials, strategy or sales incentive programs;

    r) Failed to schedule promised leadership team meetings to discuss developments with the N-Force Fixation System; e.g., integration of the technology to the A.L.P.S. plating system;
    s) Failed to make a good faith effort to commercialize the Russell Frame technology;
    t) Failed to schedule promised leadership team meetings to discuss developments with the N-Force Fixation System and the iN3 cement; and
    u) Terminated meaningful communication with Plaintiffs regarding the Earnout Products.

Am. Compl. ¶ 61. The Plaintiffs allege that the Defendant's failure "to fulfill its obligations under the SPA served to protect its existing business segments and prevented access to the technology by other medical device companies." *Id.* at ¶ 62. The measure of the Plaintiffs' damages is alleged to be the difference between the actual sales and those that reasonably could have been generated by the Defendant using "commercially reasonable efforts." *Id.* at ¶ 63.

    The SPA's integration clause provides that "[the SPA], the Buyer Ancillary Agreements, the Seller Ancillary Agreements, the Company Ancillary Agreements, and all exhibits and schedules . . . constitute the entire agreement, and supersede all prior agreements and understandings, both written and oral, among the parties." Am. Compl. Ex. A § 11.05. The SPA's choice-of-law provision provides for the application of Indiana law. *Id.* at § 11.06.

## ANALYSIS

    Under Indiana law, a breach of contract claim requires that a plaintiff show the existence of a contract, the defendant's breach of the contract, and damages to the plaintiff. *Berg v. Berg*, 170 N.E.3d 224, 231 (Ind. 2021) (citation omitted). The Plaintiffs allege that the Defendant breached the SPA by failing to use "commercially reasonable efforts" to sell the Earnout Products, as required by Section 2.05. To show the lack of such "commercially reasonable efforts," the Amended Complaint identifies twenty-one actions or inactions by the Defendant. In the instant motion to dismiss, the Defendant argues that the claim is implausible on the element

of breach because the Plaintiffs have done nothing more than second-guess the Defendant's business discretion, which it was permitted to use under the SPA, and have not alleged facts to show that the Defendant failed to use the "commercially reasonable efforts" as unambiguously defined in the SPA. The Defendant also argues that the Plaintiffs have failed to sufficiently plead damages. For the following reasons, the Court grants the motion on the element of breach.

1.  *SPA Provisions Regarding "Commercially Reasonable Efforts"*

Section 2.05(e) of the SPA mandates that the Defendant use "commercially reasonable efforts" to sell the Earnout Products:

> *Commercially Reasonable Efforts*. Following the Closing Date, [the Defendant] *shall use* Commercially Reasonable Efforts, directly and/or indirectly through its Affiliates and any licensees, to sell the Earnout Products during each Earnout Quarter, but such obligation shall not be construed to create any fiduciary or similar relationship between [the Defendant] or any of its Affiliates, on one hand, and the Plaintiffs], on the other hand. [The Plaintiffs] acknowledge that [the Defendant] and its Affiliates *shall have the right to operate their businesses in accordance with their own commercially reasonable discretion* and [the Defendant] is under no obligation to provide any specific level of investment or financial assistance to the [CelgenTek] Entities. [The Plaintiffs] further acknowledge that the payment of any Earnout Payments is speculative and subject to, among other things, the future performance of the [CelgenTek] Entities, which cannot be predicted with accuracy. Accordingly, [the Defendant] makes no representations, warranties, covenants or guaranties as to the future performance of the [CelgenTek] Entities or the likelihood of any Earnout Payments.

Am. Compl. Ex. A § 2.05(e) (emphasis added).

For purposes of measuring the Defendant's "diligence in satisfying an obligation with respect to the Earnout Products," the SPA specifically defines "commercially reasonable efforts" to mean:

> *that [the Defendant] applies the level of efforts, expertise and resources that **it** would apply in the ordinary and usual course of business to satisfaction of a comparable obligation with respect to another product or technology that is similar to the Earnout Products in terms of commercial potential, development stage and product life*. In determining whether [the Defendant] is applying Commercially Reasonable Efforts, (A) the entire business, financial, commercial, scientific,

7

> clinical and regulatory context shall be considered, including issues such as product safety and efficacy, the competitive environment, market conditions, the product's proprietary position, the extent to which health care providers would be expected to embrace the product as a desirable and competitive solution, regulatory hurdles, the product's pricing and potential profitability, and similar factors; and (B) *decisions and actions with respect to particular Earnout Products are to be evaluated in the context of the business, operations and product portfolio **of [the Defendant]** and its Affiliates* (which may result in decisions and actions that differ from those that the [CelgenTek] Entities have taken historically (or would, but for the Transactions, take prospectively) with respect to the Earnout Products).

*Id.* § 2.05(a)(i)) (emphasis added).[1]

These contractual provisions regarding "commercially reasonable efforts" measure the Defendant's diligence in selling the Earnout Products against the Defendant's own diligence in selling other similar products or technology. This is what has been termed an "inward facing definition" of "commercially reasonable efforts," namely one that "applies the buyer's own standard for undertaking research, regulatory approvals, and sales and marketing efforts." Kristian Werling et al., *"Commercially Reasonable Efforts" Diligence Obligations in Life Science M&A*, 18 No. 6 M & A Law. 16 (2014). *Compare Banas v. Volcano Corp.*, 47 F. Supp. 3d 941, 946–47 (N.D. Cal. 2014) (finding, on summary judgment, that the plaintiffs failed to offer evidence of a breach of the contractual requirement to use "commercially reasonable efforts" to meet certain milestones where the term was defined as "the use of efforts, sales terms, expertise and resources normally used by [*the buyer*] for other [similar] products" and the plaintiffs failed to "identify a relevant comparator product against which [the buyer's] efforts on the earnout products could be measured" (emphasis added)), *with Neurvana Med., LLC v. Balt USA, LLC*, No. 2019-0034, 2020 WL 949917, at *16 (Del. Ch. Feb. 27, 2020) (recognizing that

---

[1] The first two times this provision is quoted in the Plaintiffs' response brief, the word "it" is omitted from the opening sentence, materially changing the meaning of the definition. *See* Pl. Resp. 1, 6, ECF No. 65 ("the level of efforts, expertise and resources that would apply in the ordinary and usual course of business"). The subsequent quotations of the provision are correct. *Id.* at 10, 12, 16, 17, 18.

definitions of "commercially reasonable efforts" that compare the buyer's efforts to those of other similarly situated businesses "impose an objective 'outward facing definition,' which 'applies an *industry-standard requirement* or looks to *other participants* in the industry to define the diligence obligations of the buyer'" and that these definitions are "seller friendly" (emphasis added) (quoting Werling, *supra*, *as available at* https://www.natlawreview.com/article/commercially-reasonable-efforts-diligence-obligations-life-science-ma-mergers-and-ac)).

When read closely, all aspects of Sections 2.05(a)(i) and 2.05(e) reinforce the discretion vested in the Defendant to treat the Earnout Products as it would its other similar products. The first sentence of the definition in Section 2.05(a)(i) requires the Defendant to apply the efforts "it"—meaning the Defendant—would apply in the ordinary and usual course of business. And the measure of that effort is the Defendant's "comparable obligation with respect to another product or technology that is similar to the Earnout Products." The definition then details two criteria by which to determine if the Defendant is applying "commercially reasonable efforts." Subpart (A) essentially addresses the relevant market receiving the Earnout Products. Subpart (B) is clear that the Defendant's efforts with regard to the Earnout Products "are to be evaluated in the context of the business, operations and product portfolio of [the Defendant]." Subpart (B) also cautions that the Defendant's business decisions may be different "from those that the [CelgenTek] Entities have taken historically (or would, but for the Transactions, taken prospectively) with respect to the Earnout Products." Notably, the Plaintiffs ignore subpart (B) in their response brief.

In addition, Section 2.05(e)—the provision requiring the Defendant to use "commercially reasonable efforts" to sell the Earnout Products—contains the Plaintiffs' bargained-for acknowledgement that the Defendant and its affiliates "shall have the right to operate their

9

businesses in accordance with their own commercially reasonable discretion." The Plaintiffs ignore this provision in their response brief as well. The other two provisions of Section 2.05(e) are the Plaintiffs' acknowledgements that payment of Earnout Payments is speculative and that the Defendant makes no guaranties regarding the likelihood of Earnout Payments.

In their response brief, the Plaintiffs argue that the issue of "commercially reasonable efforts" is a question of fact not properly resolved on a motion to dismiss. However, the cases they cite address contracts that either contain no definition of "commercially reasonable efforts" or contain seller-friendly, objective, outward facing definitions of "commercially reasonable efforts" that look to other companies as the measure of effort. None of the cases address a contract with an inward facing definition of "commercially reasonable efforts" that allows the buyer, like the Defendant in this case, to use its business discretion and then measures the buyer's efforts against the buyer's treatment of its own similarly situated products. *See Himawan v. Cephalon, Inc.*, No. 2018-0075, 2018 WL 6822708, at *6 (Del. Ch. Dec. 28, 2018) (seller-friendly, outward facing contract that defined "commercially reasonable efforts" to mean "the exercise of such efforts and commitment of such resources by a company with substantially the same resources and expertise as [the buyer], with due regard to the nature of efforts and cost required for the undertaking at stake"); *Holland Loader Co. v. FLSmidth A/S*, 313 F. Supp. 3d 447, 472–73 (S.D.N.Y. 2018) (no contractual definition); *Elorac, Inc. v. Sanofi-Aventis Can., Inc.*, No. 14 C 1859, 2017 WL 3592775, at *1 (N.D. Ill. Aug. 21, 2017) (seller-friendly, outward facing definition); *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 763 (7th Cir. 2010) (no contractual definition); *Rexing Quality Eggs v. Rembrandt Enters., Inc.*, 360 F. Supp. 3d 817, 845 (S.D. Ind. 2018) (Iowa UCC law applied to the term "commercially reasonable" regarding performance under a contract to sell eggs); *Citri-Lite Co. v. Cott Beverages, Inc.*, 721 F. Supp.

2d 912, 915 (E.D. Cal. 2010) (no contractual definition); *Gifford v. J & A Holdings*, 63 Cal. Rptr. 2d 253, 259 (Cal. Ct. App. 1997) (definition of "commercially reasonable" under California's Bulk Sales law); *Sempra Energy Res. v. Cal. Dep't of Water Res.*, No. D043397, 2005 WL 1459950, at *9 (Cal. Ct. App. June 21, 2005) (no contractual definition).[2]

Thus, the parties' bargained-for standard to determine whether the Defendant used "commercially reasonable efforts" to sell the Earnout Products looks to the Defendant's own conduct regarding other similar products. The Defendant's efforts are not measured, as suggested by the Plaintiffs, against industry standards or the conduct of other companies in similar situations. *See Hartman v. BigInch Fabricators & Constr. Holding Co.*, 161 N.E.3d 1218, 1223 (Ind. 2021) (recognizing that when a contract's language is unambiguous, the language is given "its plain and ordinary meaning in light of the whole agreement").

2.   *The Factual Allegations of the Amended Complaint*

Turning to the Amended Complaint, the only factual allegations offered to show that the Defendant did not use "commercially reasonable efforts" are the twenty-one actions and inactions in paragraph 61. However, these allegations do nothing more than express the Plaintiffs' disagreement with the Defendant's business decisions without any facts to plausibly demonstrate that the Defendant's efforts did not meet the inward facing definition of

---

[2] Subsequent decisions treat this issue similarly. *See, e.g.*, *Specialty Earth Scis., LLC v. Carus Corp.*, No. 15-CV-06133, 2021 WL 4804076, at *6, 13–14 (N.D. Ill. Oct. 14, 2021) (no contractual definition); *E. Claiborne Robins Co. v. Teva Pharm. Indus., Ltd.*, No. 3:18CV827, 2022 WL 598054, at *2 (E.D. Va. Feb. 28, 2022) (inward facing provision defined by outward facing standards); *Alto v. Sun Pharm. Indus., Inc.*, No. 1:19-CV-09758, 2021 WL 4803582, at *41–42 (S.D.N.Y. Oct. 13, 2021) (no contractual definition); *Pac. Controls Inc. v. Cummins Inc.*, No. 1:19-CV-03428, 2021 WL 4462725, at *7 (S.D.N.Y. Sept. 29, 2021) (same); *S'holder Rep. Servs. LLC v. Alexion Pharm., Inc.*, No. 2020-1069, 2021 WL 3925937, at *2 (Del. Ch. Sept. 1, 2021) (objective, outward facing provision); *InspiRx, Inc. v. Lupin Atlantis Holdings SA*, 554 F. Supp. 3d 542, 548–49 (S.D.N.Y. 2021) (same); *Shane Campbell Gallery, Inc. v. Frieze Events, Inc.*, 838 F. App'x 608, 610 (2d Cir. 2020) (no contractual definition); *Bioventus LLC v. Trindent Consulting Int'l, Inc.*, No. 1:18-CV-815, 2020 WL 8996156, at *5 (M.D.N.C. Oct. 20, 2020) (same).

"commercially reasonable efforts" in the SPA. Conspicuously missing from the Amended Complaint is any allegation, whether a bare allegation or a factually supported one, that these twenty-one actions and inactions diverged from the level of efforts, expertise, and resources applied by the Defendant in the ordinary and usual course of its business.

Looking more closely at the allegations, the Defendant correctly describes subparagraphs (e), (r), and (t) as claims of broken promises, purportedly made before entering into the SPA, to initiate a global clinical trial and to schedule leadership team meetings. The Defendant argues that claims are expressly precluded by the SPA's integration clause. The Plaintiffs offer no response to this argument. Moreover, the Plaintiffs dropped the claim of fraudulent inducement with the Amended Complaint.

The Defendant contends that the allegations in subparagraphs (j), (l), (m), (p), (q), (s), and (u) are unsupported, vague, and irrelevant conclusory assertions. These paragraphs allege that the Defendant failed to take several actions such as transferring the manufacturing of the iN3 cement to a Zimmer Biomet facility; meeting customer orders in Europe; supporting new European sales; developing marketing materials, strategy, or sales incentive programs; and making a good faith effort to commercialize certain technology. The paragraphs also allege that the Defendant removed instrumentation sets from customer locations and terminated meaningful communication with Plaintiffs. As for paragraphs (a)–(d), (f)–(i), (k), (n), and (o), the Defendant argues that these are attempts to mischaracterize and second-guess its alleged business decisions—decisions that it was permitted to make within its discretion under the SPA. These paragraphs allege that the Defendant failed to retain the members of the CelgenTek commercial team, to engage with the CelgenTek Medical Advisory Boards in Europe and North America, to secure manufacturing capability for the N-Force Fixation System, to commercialize the product

in Australia, and to ship the products to Australia despite multiple staff training and registration fees. These paragraphs also allege that the Defendant sent a field notification to customers regarding the termination of product supply, allowed the CE Mark regulatory approvals to expire, ceased N-Force product manufacturing at a facility, terminated a clinical trial, terminated key individuals, and terminated a supply and distribution agreement with a German company.

The Defendant is correct that, under the SPA, it had no specific contractual obligation to take any of the actions the Plaintiffs allege it failed to take; the Plaintiffs could have bargained for these specific requirements in the contract but did not. And, under Section 2.05 of the SPA, actions that CelgenTek may have taken in the past or that the Plaintiffs would have preferred the Defendant to take after the SPA are not relevant to the analysis. Asserting that many of these actions are the type that necessarily occur with a failing business, the Defendant notes that the Plaintiffs provide no factual or time-based context for these events, which appear to have allegedly occurred over a 40-month period beginning January 1, 2017.

None of Plaintiffs' allegations identify any efforts the Defendant normally takes based on its reasonable business judgment in regard to a similar product, nor do they show why the efforts with the Earnout Products were not commercially reasonable when measured against the Defendant's normal "business, operations and product portfolio." The SPA granted the Defendant the discretion to make business decisions with respect to CelgenTek products and decide what financial resources it should or should not devote to developing, marking, and selling those products. The Plaintiffs have not alleged any facts to show that the Defendant deviated from its standard conduct. As a result, the possibility that these twenty-one actions or inactions is a breach of the inward facing contractual definition of "commercially reasonable efforts" is nothing more than speculation and conjecture and does not rise to the level of

plausibility. *See Iqbal*, 556 U.S. at 679 ("But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (quoting Fed. R. Civ. P. 8(a)(2)).

*Himawan v. Cephalon*, cited by the Plaintiffs, is distinguishable on the sufficiency of the facts alleged in the complaint regarding the standard against which the defendant's conduct was measured. As noted above, the contract in *Himawan* contained an objective, outward facing definition of "commercially reasonable efforts." 2018 WL 6822708, at *6. The court found that the plaintiffs stated a claim for breach of contract based on that definition because they had "point[ed] to other companies and their efforts to develop similar medical treatments, as exemplars against which the Defendants efforts fall short." *Id.* at *1, 8. More similar to the instant case is *Neurvana Medical v. Balt USA*. Like the contract in *Himawan*, the contract in *Neurvana Medical* contained an objective, outward facing definition of "commercially reasonable efforts." 2020 WL 949917, at *16. However, in *Neurvana Medical*, the court granted the motion to dismiss because the plaintiff did not "plead any facts that could conceivably support a claim for breach of that standard" where the plaintiff did "not identify a single 'entity in the medical device industry of similar resources and expertise as' [the defendant]." *Id.*

"Indiana courts have long recognized and respected the freedom of parties to enter into contracts and have presumed that those contracts represent the freely bargained agreements of the parties." *SAMS Hotel Grp., LLC v. Environs, Inc.*, 716 F.3d 432, 435 (7th Cir. 2013) (citing *Haegert v. Univ. of Evansville*, 977 N.E.2d 924, 937 (Ind. 2012)). "Sophisticated commercial actors should be free to allocate risks as they see fit, and courts should not interfere simply because such risks have materialized." *Rheem Mfg. Co. v. Phelps Heating & Air Conditioning, Inc.*, 746 N.E.2d 941, 950–51 (Ind. 2001). The allegations of the Amended Complaint

demonstrate that the Plaintiffs knew before entering into the SPA that CelgenTek's products were failing to generate the expected volume of purchase orders and that CelgenTek was in dire financial circumstances. Nevertheless, the Plaintiffs, as sophisticated commercial actors, bargained for the inward facing definition of "commercially reasonable efforts" contained in the SPA. The Plaintiffs cannot now change the definition to an objective, outward facing one because they are disappointed with the results of the Defendant's business decisions.

Finally, the Defendant argues the implausibility of the Plaintiffs' allegation that it purposefully failed to use commercially reasonable efforts to sell the products because it was trying "to protect its existing business segments and prevent[] access to the technology by other medical device companies." Am. Compl. ¶ 62. Indeed, the Amended Complaint does not contain any facts to raise this allegation above the level of speculation, such as what other of the Defendant's "existing business segments" would have benefitted from the failure of the Earnout Products or what other medical device companies would have been interested in obtaining access to the technology. The Defendant also notes the allegations that sales of the Earnout Products were already poor at the time of the SPA such that the Defendant could have simply let CelgenTek fail in 2015 rather than buy it for over $17 million.

Because the Plaintiffs have failed to allege any facts to plausibly show that the Defendant failed to use "commercially reasonable efforts," as defined in the SPA, in selling the Earnout Products, the Plaintiffs have failed to state a claim of breach of contract, and the Court grants the motion to dismiss. Thus, the Court need not consider the Defendant's argument as to damages.

3. *The Plaintiffs' Request to Amend the Complaint and the Defendant's Request for Dismissal with Prejudice*

The Plaintiffs ask the Court for leave to file a second amended complaint should the Defendant's motion be granted. Federal Rule of Civil Procedure 15(a)(2) provides that the Court

15

should freely grant leave to amend a pleading "when justice so requires." Fed. R. Civ. P. 15(a)(2). However, district courts have "'broad discretion' to deny leave to amend, 'where there has been undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies, undue prejudice to the defendants, or where the amendment would be futile.'" *Huon v. Denton*, 841 F.3d 733, 745 (7th Cir. 2016) (quoting *Arreola v. Godinez*, 546 F.3d 788, 796 (7th Cir. 2008)).

Before the case was transferred to this Court, the Defendant filed a motion to dismiss the four counts of the original Complaint; the transferor court denied the motion without prejudice. Upon transfer and before the motion was refiled, the Plaintiffs filed the Amended Complaint with leave of court. Thus, the Plaintiffs have already had a second opportunity to allege sufficient facts to plausibly state a claim for breach of contract. More importantly, the Plaintiffs have not shown why an amendment would not be futile. They state generally that they could offer additional ways in which the Defendant failed to use commercially reasonable efforts to market and sell the technology but give no examples that would cure the defects of the Amended Complaint. Finally, the Defendant would be prejudiced by having to defend against another complaint given the time and resources already spent in filing two motions to dismiss.

Therefore, the Court denies the Plaintiffs' request to file a second amended complaint and finds that dismissal with prejudice is appropriate because the Plaintiffs have not shown that they can state a plausible claim for relief. *See O'Boyle v. Real Time Resolutions, Inc.*, 910 F.3d 338, 348 (7th Cir. 2018) (affirming dismissal and denial of motion to amend because none of the proposed theories "push[ed] the original claim into the realm of plausibility"); *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 335 (7th Cir. 2018) ("Nothing in Rule 15, nor in any of our cases, suggests that a district court must give leave to amend a complaint where a party does not request it or suggest to the court the ways in which it might cure the defects. To

the contrary, we have held that courts are within their discretion to dismiss with prejudice where a party does not make such a request or showing.").

## CONCLUSION

Based on the foregoing, the Court hereby GRANTS the Defendant's Motion to Dismiss Plaintiffs' First Amended Complaint [ECF No. 61] and DISMISSES the Amended Complaint with prejudice.

SO ORDERED on August 15, 2022.

                                            s/ Theresa L. Springmann
                                            JUDGE THERESA L. SPRINGMANN
                                            UNITED STATES DISTRICT COURT